## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 31 2020, 9:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel C. Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of: | January 31, 2020 |
| J.D., Jr. and S.D. (Minor Children) | Court of Appeals Case No. 19A-JT-1882 |
| and | Appeal from the Putnam Circuit Court |
| J.D. (Father), *Appellant-Respondent,* | The Honorable Matthew L. Headley, Judge |
| v. | Trial Court Cause Nos. 67C01-1812-JT-23 67C01-1812-JT-24 |
| The Indiana Department of Child Services, *Appellee-Petitioner.* | |

**Bailey, Judge.**

# Case Summary

J.D. ("Father") appeals the trial court's judgment terminating his parental rights to his children, J.D., Jr. ("Jr."), and S.D. (collectively, "Children"). He raises one issue on appeal, which we restate as whether the trial court clearly erred when it terminated his parental rights.

We affirm.

# Facts and Procedural History

Father and A.S. ("Mother")[1] are the parents of Jr., who was born on June 27, 2005, and S.D., who was born on January 8, 2007. Mother left the family and has not seen Children since they were very young. Children lived with Father and M.A., who is Father's girlfriend, and M.A.'s children.

On March 1, 2017, M.A. reported to the Indiana Department of Child Services ("DCS") that Children were touching each other inappropriately. DCS entered into an informal adjustment with Father and M.A., and Children remained in the home. However, on August 17, DCS received a report alleging Children were victims of physical abuse. M.A. had pushed Jr., leaving scratches and

---

[1] Mother does not actively participate in this appeal.

bruises on him. Children disclosed to DCS that both Father and M.A. physically disciplined them by grabbing, pushing, and whipping them with a belt. Father indicated that Children were defiant and needed help. Service providers attempted to provide counseling for Children and Father but M.A. refused to participate in any services unless her participation was court-ordered.

[5] On August 28, 2017, based on the physical abuse of Children and M.A.'s refusal to participate in services, DCS filed a petition alleging Children were Children in Need of Services ("CHINS"). On September 26, S.D. was removed from the home, and, on December 7, Jr. was also removed from the home. On December 20, 2017, Father admitted the CHINS allegations were true, and the court found Children to be CHINS. The court issued a dispositional decree under which Children's parents and M.A. were ordered to cooperate with DCS and engage in services, and parents were ordered to engage in family therapy. However, Father did not enter into family therapy until thirteen months later.

[6] At a hearing on August 23, 2018, the trial court heard testimony that M.A.'s unwillingness to have Children in the home was the biggest barrier to reunification. The trial court found that Father continued to blame Children for family problems and failed to see how it was impacting Children that M.A. did not want them in their home. Father testified that it was possible M.A. would be willing to have Children back in the home in four months. The court approved a plan of adoption for Children, concurrent with the plan for reunification, and the court specifically noted in its order that M.A. must come

to the next hearing so that the court could ascertain her willingness to participate.

[7] On September 21, 2018, the court entered an order restricting all visitation to therapeutic visits after the discovery of a letter that M.A. had written and that Father had given to Jr. M.A. did not come to the next hearing, which was held on November 20, 2018. In the order from the hearing on November 20, the court described the contents of the letter M.A. had written to Jr. as "inappropriate at best and emotionally abusive at worst." Appealed Order at 8. The court also found Father's November 20 testimony regarding the letter was "not plausible." *Id*. At the November 20 hearing, "all parties continued to agree that the barrier to the Children returning home was that [M.A.] did not want them, and Father was not willing to choose the Children over his girlfriend." *Id*. at 9. The court found that the letter written by M.A. and delivered by Father to Jr. was a "major setback." *Id*.

[8] On December 14, 2018, DCS filed petitions to terminate the parents' rights to Children. The court held a bifurcated factfinding hearing on March 5, 2019, and June 3, 2019. On July 2, 2019, the trial court issued its order terminating Mother's and Father's parental rights to Children. The order adopted the factual findings of the CHINS court and also cited, in relevant part, the following evidence:

* * *

40. The Children's involvement with DCS stemmed from problems between the Children and [M.A.] and Father's own parenting and protecting inadequacies.

41. Even prior to DCS involvement, the family was involved with Juvenile Probation.

42. The children had school attendance issues at a young age.

43. Chief Juvenile Probation Officer Renee Marstellar was troubled by her observations of [M.A.]'s behavior toward the Children.

44. Officer Marstellar observed [M.A.] to treat her biological children differently than [Children].

45. Officer Marstellar observed that [Children] were not allowed to touch or interact with [M.A.]'s children.

* * *

51. [M.A.] was substantiated on [sic] for physical abuse of [Jr.] by DCS.

52. [Jr.] had bruising as a result of an altercation with [M.A.].

53. Like Officer Marstellar, [Family Case Manager ("FCM")] Kacey Schuerman personally observed troubling interactions between [M.A.] and the Children.

54. FCM Schuerman personally observed constant conflict, excessive punishment, and hateful speech.

55. Father and [M.A.] struggled to come up with "a single positive thing" to say about the Children to FCM Schuerman.

56. FCM Schuerman observed no emotional connection between [M.A.] and [Children].

57. FCM Schuerman observed [M.A.] to treat her biological children differently than she treated [Children].

58. FCM Schuerman described an observed "hatred" of the children by [M.A.].

59. FCM Schuerman testified that [Children] were not allowed to look at or touch [M.A.]'s biological children.

60. FCM Schuerman relayed an incident where [M.A.] kicked one of the [Children] out of her car for talking to and/or looking at one of [M.A.]'s biological children against her rules.

61. FCM Schuerman personally observed [M.A.] screaming at [Children] for a minor rule infraction (getting a drink of water without permission).

62. FCM Schuerman's concerns were never alleviated during the time she managed the case.

63. Allison Everman, FCM Supervisor ["FCMS"], participated in "CFTM" meetings with this family and assisted in the transfer of the case from FCM Schuerman to FCM Greenwell.

64. Like Officer Marstellar and FCM Schuerman, FCMS Everman personally observed [M.A.] to be hostile and verbally aggressive about [Children].

65. FCM Heather Greenwell participated in a "smooth" transition of the case from FCM Schuerman to herself….

66. FCM Greenwell developed the same concerns described by Officer Marstellar, FCMS Everman, and FCM Schuerman.

\* \* \*

68. FCM Greenwell testified that Father has not complied with the terms of his dispositional order.

    a. Specifically, FCM Greenwell testified that Father failed to enroll in programs in a timely fashion [for] various reasons such as, [M.A.] is afraid of Children, [M.A.] does not want to participate in family therapy, and they have no childcare for their other children.

    b. FCM Greenwell testified that Father was resistant to allowing her and providers into the home to monitor their compliance.

    c. FCM Greenwell testified that she fought with Father the entire case over the requirement that he sign releases, specifically that he consistently delayed signing releases for [S.D.] to get needed medication. FCM Greenwell and other providers testified that [S.D.] has extreme difficulty functioning in his daily life without his medication. [S.D.]'s teacher Megan Schroeder testified that receiving medication is critical to [S.D.]'s success, in that he goes from pacing and blatant oppositional defiant behaviors to more kind, organized, and "a totally different kid." [S.D.]'s Life Skills Provider Kelly Spradlin reiterated that when on medication, [S.D.] went from being sent home from school every week to excelling in school.

d. FCM Greenwell testified that Father has failed to maintain safe and suitable housing, in that the home is generally in disarray and there is no room set up for the Children to come home to. Parent Educator Sarah Kirk confirmed that the family cannot reunify in their current home.

e. FCM Greenwell testified that Father has failed to meet the medical and emotional needs of the Children. Chief Juvenile Probation Officer Renee Marstellar confirmed, for example, that Father only visited [S.D.] during his residential placement at ResCare twice between September of 2017 and January of 2018. Officer Marstellar testified that Father failed to participate in counseling with [S.D.] while [S.D.] was placed at ResCare.

f. FCM Greenwell testified that Father has failed to assure a safe, secure and nurturing environment for the Children, specifically pointing to Father's delivery of the letter from [M.A.] to [Jr.]. Licensed Clinical Social Worker Erica Johnson is the family's current therapist and therapeutic supervised visitation provider, [and] she testified to 130 hours of involvement with the family, including the Saturday prior to trial. Therapist Johnson confirmed that [M.A.] is not ready to parent [Children]. Therapist Johnson confirmed that the family is in the beginning stages of therapy. Therapist Johnson testified that although there has been some progress, the family is not ready for reunification. Foster Parent Sandy Byerly confirmed that [Jr.] has a negative reaction and negative behaviors around the time of visitations. [S.D.]'s Life Skills Provider Kelly Spradlin testified that she has a close bond with [S.D.], and that [S.D.] did not want to go to visitations. She further testified that she has seen no evidence of a strong bond between [S.D.] and his Father

and [M.A.], and that [S.D.] describes flashbacks of prior abuse.

g. FCM Greenwell testified that Father has failed to maintain suitable income, in that the family barely scratches by….

* * *

i. FCM Greenwell testified that Father has failed to assist in a protection plan for the Children, in that he continually sides with [M.A.] over them, has a continued lack of understanding of their role in the Children's wellbeing, and that he participates in and fails to stop [M.A.]'s emotional abuse.

69. FCM Greenwell testified to extensive efforts at reunification, identifying thirty-plus service providers.

70. No service provider testified that Parents are ready to reunify.

71. FCM Greenwell testified that [M.A.] is scared of [Jr.].

72. FCM Greenwell testified that the conditions that led to removal have not been remedied.

73. FCM Greenwell testified that a continued parent/child relationship is a threat to the Children's wellbeing, stating that [M.A.] has physically abused them and emotionally abused them, and that Father has allowed it to occur.

* * *

77. Father's brother, [C.D.], testified to extensive knowledge regarding this family.

78. Father and the Children lived with [C.D.] for approximately two years shortly before DCS involvement.

79. [C.D.] observed [Children] to be treated poorly by Father and [M.A.].

80. [C.D.] observed yelling, anger, and [Children] not being allowed to interact with [M.A.]'s biological children.

81. [C.D.] testified that what he saw and heard was verbally abusive and would leave the Children in tears.

82. Visitation Supervisor Mike Martin testified that he supervised visitation between [Jr.] and Father.

* * *

84. Visitation Supervisor Martin observed very negative interactions between Father and [Jr.].

85. Visitation Supervisor Martin testified that there were no hugs or goodbyes, that the relationship was more akin to strangers on an elevator.

86. Visitation Supervisor Martin testified that he did not observe affectionate or caring behavior by Father.

87. Visitation Supervisor Martin observed a lack of bond.

88. Visitation Supervisor Martin observed an incident where security came in to check on them due to [M.A.]'s loud and belligerent behavior.

89. Visitation Supervisor Martin observed no improvement in the relationship over time.

* * *

92. [S.D.'s] teacher [Megan] Schroeder stated that [S.D.] thrives on positive reinforcement and that is what he needs.

93. [M.A.] testified that she wrote a letter to [Jr.] that was delivered by his Father during a supervised visitation shortly before this termination action was filed.

94. [M.A.] testified that FCM Greenwell told her to write the letter. FCM Greenwell denied this. The Court specifically finds [M.A.]'s testimony on this matter suspect.

95. [M.A.] testified that the issues identified in the letter have been resolved through therapy, but did not offer any proof from a therapist or therapist notes. The family's current therapist, Erica Johnson, testified that the letter has not yet been addressed in her family therapy and that she plans to do so in the future. The Court specifically finds [M.A.]'s testimony on this matter suspect.

96. [M.A.] testified that if the family is reunified, she will be the primary caregiver responsible for meeting the Children's needs as the stay-at-home mom.

97. Therapist Johnson testified that at therapeutic family visits, [M.A.] takes the dominant role between [M.A.] and Father in correcting and disciplining the Children.

98. [M.A.] testified that if the family is reunified, she will need special rules for [Children].

99. Although [M.A.] testified that she doesn't feel differently about [Children] than her own biological children, Father was unable to answer the question of whether she treats his children differently than her own.

100. [M.A.] testified that she received two years of parent training prior to writing the letter to [Jr.].

101. [M.A.] testified that the contents of the letter are true.

102. In the letter, [M.A.] described [Jr.] as "terrifying," a "liar," "manipulative," and "dangerous" while admitting that Father was responsible for raising him.

103. In the letter, [M.A.] wrote to [Jr.] that she "can't just let go what you have done to myself or MY children!!!"

104. In the letter, [M.A.] wrote to [Jr.] twenty-two pages of all the ways in which the Child has allegedly wronged her.

105. In the letter, [M.A.] wrote to [Jr.] "I'm scared/terrified of you!! [L.] is terrified of you! [S.D.] is scared of you!!"

106. In the letter, [M.A.] wrote to [Jr.] "Your poor Father can't be happy!"

107. In the letter, [M.A.] wrote to [Jr.] "Yes, I NEVER want you around my 2 kids or myself ever again!"

108. In the letter, [M.A.] wrote to [Jr.] that he has made her life hell.

109. In the letter, [M.A.] wrote to [Jr.] that she has panic attacks thinking about seeing him.

110. In the letter, [M.A.] wrote to [Jr.] that she miscarried a baby due to stress from how she is treated.

111. In the letter, [M.A.] wrote to [Jr.] that "EVERY thing you have done to me and my kids will always be there."

112. In the letter, [M.A.] wrote that her eight-year-old and 23-month-old make her feel like trash and disrespect her.

113. In the letter, [M.A.] excuses her treatment of [Jr.] as merely "tough love."

114. In the letter, [M.A.] takes no responsibility for the breakdown of the family relationships.

115. In her testimony, [M.A.] continued to take no responsibility for the breakdown of the family relationships.

116. [Jr.]'s foster mother Sandy Byerly testified that [Jr.] has a negative reaction and negative behaviors surrounding interactions with [M.A.] and Father, describing him as sad, agitated, and angry around visitations.

117. [Jr.]'s grades dropped and his behavior changed after receipt of the letter, according to Foster Mom Byerly.

118. Testimony indicates that a letter was also given to [S.D.], the contents of which are unknown because he destroyed it.

119. [S.D.]'s Life Skills Specialist Kelly Spradlin testified [S.D.] also has a negative reaction to visits.

120. Specialist Spradlin testified that [S.D.] needs a strong bond with someone who will not leave him.

121. Visitation Supervisor Alyssa Burch testified that she was the visitation supervisor at the time that the letter was delivered by Father to the child [Jr.].

122. Visitation Supervisor Alyssa Burch testified that [Jr.] cried while reading it, and that Father saw the Child was visibly upset and urged him to keep reading.

* * *

126. Father denied knowing the contents of the letter prior to delivering it, despite Alyssa Burch's testimony that he sat with [Jr.] and encouraged him to keep reading.

* * *

130. Father was asked if seeing the letter made him realize the level of hatred [M.A.] has for his [Children], and he responded "I guess so."

* * *

133. FCM Greenwell stated that termination is the Children's best interest.

* * *

136. [C.D.] testified, with obvious personal distress, that based on his personal experience and observations, termination of parental rights is in the Children's best interest.

* * *

138. Officer Marstellar testified that termination of parental rights is in [S.D.]'s best interest.

* * *

140. Visitation Supervisor Martin testified that at the time he had the case, he was not comfortable with reunification.

141. Foster Parent Sandy Byerly testified that reunification is not in [Jr.]'s best interest in light of his wishes, his negative reactions to visitation, and her extensive knowledge of his needs.

142. Foster Parent Sandy Byerly testified that she has not observed any improvement in [Jr.]'s reactions to visitations over time.

143. Parent Educator Sarah Kirk testified that the family is not ready to reunify.

144. Therapist Erica Johnson testified that the family is not ready to reunify.

* * *

148. CASA [Ted] Davis testified to positive progress [Children] have made while in [out-of-home] care.

* * *

150. CASA Davis testified that it would be damaging for the Children to be returned to Father and [M.A.]'s care.

151. CASA Davis testified that time is of the essence, and that delaying permanency can be detrimental to [Children].

152. CASA and FCM concur that termination followed by adoption is in the Children's best interest due to the inability of Mother and Father/[M.A.] to provide appropriate care and supervision for the Children.

153. DCS' plan for Children is that they be adopted, there are numerous family members who are interested in pursuing adoption, and this plan is satisfactory.

Appealed Order at 9-21 (emphasis original).

[9]     Based on that evidence, the trial court found,[2] in relevant part, as follows.

---

[2] Although the trial court titled this section of its opinion "Conclusions of Law," it also noted that "[a]ny matter … which may be found as a Conclusion of Law is hereby so deemed, and any matter … which may be found as a Finding of Fact is hereby so deemed." *Id*. at 26. And we are not bound by the trial court's characterization of its results as findings of fact or conclusions of law. *E.g.*, *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002).

\* \* \*

14. In applying the law to this case, the Court expressly finds by clear and convincing evidence that Father's choices—namely, his continued relationship with the physically and emotionally abusive [M.A.]—have created the circumstances that led to the Children's removal and his own inability to reunify.

15. … [M.A.]'s lack of commitment to the CHINS process, as well as her own handwritten letter, demonstrate her lack of commitment to [Children] and show a reasonable probability that she will fail them again.

16. … [M.A.]'s behavior toward the children is emotionally abusive.

17. … Father has failed to protect the Children from, and has directly participated in, emotional abuse.

18. … recent nominal improvements by Father and [M.A.] are not enough to overcome their demonstrated history of conduct.

19. … Father and [M.A.]'s lack of progress has a causal connection to emotional damage to the Children.

20. … Children have been abused by Parents and [M.A.].

21. … Father and [M.A.] have an inability or unwillingness to fundamentally show love to and nurture the Children, therefore reunification cannot be safely achieved at this time.

22. It is abundantly apparent to the Court, by clear and convincing evidence, that [M.A.] does not love the Children, that

she resents and loathes them, that the Children are aware of this, and that Father has failed to stop any of it from occurring.

23. It is abundantly apparent to the Court, by clear and convincing evidence, that the Children have an innate and fundamental need to feel loved and wanted.

24. It is abundantly apparent to the Court, by clear and convincing evidence, that the Parents and [M.A.] cannot meet this most basic fundamental need.

*Id*. at 24-26. Based on those findings, the trial court concluded there was a reasonable probability that the conditions that resulted in Children's removal from the home will not be remedied; that continuation of the parent-child relationship posed a threat to Children's well-being; that termination of parental rights was in Children's best interests; and that DCS had a satisfactory plan for the care and treatment of Children, namely, adoption. Father now appeals.

# Discussion and Decision

## Standard of Review

[10] Father maintains that the trial court's order terminating his parental rights was clearly erroneous. We begin our review of this issue by acknowledging that the traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *See, e.g.*, *Z.G. v. Marion Cty. Dep't of Child Serv.* (*In re C.G.*), 954 N.E.2d 910, 923 (Ind. 2011). However, a trial court must subordinate the interests of the

parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Office of Family & Children (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[11] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, among other things:

> (A) that one (1) of the following is true:
>
> * * *
>
>> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>
>> (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii)  The child has, on two (2) separate occasions, been adjudicated a child in need of services.

> * * *

> (C) [and] that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2).  DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights.  *Id*. DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[12]  When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses.  *Peterson v. Marion Cty. Office of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*.  Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment.  *Id.*  Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Office of Family & Children (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[13]  Here, in terminating Father's parental rights, the trial court entered specific findings of fact and conclusions thereon.  When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of

review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[14] Although Father purports to challenge the trial court's factual findings, he actually does not specifically challenge any of them. Rather, he contends that the trial court failed to give enough emphasis to the recent positive steps Father allegedly has taken. On that basis, Father challenges the trial court's conclusions that Father will not remedy the conditions that resulted in Children's removal, that the continuation of the parent-child relationship poses a threat to the well-being of Children, that termination is in the best interests of Children, and that DCS has a satisfactory plan for Children's care. Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we only address whether the trial court erred in concluding that Father is not likely to remedy the conditions that resulted in Children's removal, that termination is in Children's best interest, and that DCS has a satisfactory plan.

## Conditions that Resulted in Children's Removal

[15] Father maintains that the trial court erred in finding a reasonable probability that the conditions that resulted in Children's removal will not be remedied. In

support, he points to evidence of his very recent compliance with some of the court's requirements, such as engaging in family therapy. However, Father's arguments on appeal are simply requests that we reweigh the evidence, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265. Instead, we must determine whether the evidence most favorable to the judgment supports the trial court's conclusion. *Id.*; *Quillen*, 671 N.E.2d at 102.

[16] In determining whether the evidence supports the trial court's finding that Father was unlikely to remedy the reasons for removal, we engage in a two-step analysis. *E.M. v. Ind. Dep't of Child Servs.* (*In re E.M.*), 4 N.E.3d 636, 643 (Ind. 2014). "First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quotations and citations omitted). In the first step, we consider not only the initial reasons for removal, but also the reasons for continued placement outside the home. *T.Q. and A.Q. v. Ind. Dep't of Child Serv.* (*In re N.Q.*), 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). In the second step, the trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re E.M.*, 4 N.E.3d at 643. However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted); *see also In re M.S.*, 898 N.E.2d 307, 311 (Ind. Ct. App. 2008) (noting the "trial court need not wait until a child is irreversibly harmed such that his

physical, mental, and social development are permanently impaired before terminating the parent-child relationship"). In evaluating the parent's habitual patterns of conduct, the court may disregard efforts made shortly before the termination hearing and weigh the history of the parents' prior conduct more heavily. *R.C. v. Ind. Dep't of Child Serv.* (*In re K.T.K.*), 989 N.E.2d 1225, 1234 (Ind. 2013). And DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Moore*, 894 N.E.2d at 226.

[17] Here, Children were originally removed due to M.A.'s physical and emotional abuse and neglect of Children, Father's complicity and/or participation in such abuse and neglect, and M.A.'s refusal to engage in services. The trial court did not err in concluding that there is a reasonable probability that the abuse and neglect would continue if Children were returned to Father's and M.A.'s care. Father failed to engage in family therapy, as ordered, for the first thirteen months of the CHINS case. Even after entering family therapy, Father and M.A. made minimal progress, and neither had an apparent bond with Children. In fact, M.A. and Father took a major step backwards in their relationships with Children when M.A. wrote an emotionally abusive letter to Jr. and Father gave the letter to Jr. during supervised visitation and instructed him to keep reading it even as Jr. was crying.

[18] M.A. continued to be emotionally abusive to Children and express dislike for them throughout the CHINS and termination proceedings. Father continually allowed such abuse and even took part in it in regards to the letter to Jr. Both

Jr. and S.D. had negative reactions to the visitations with Father and M.A., right up to the time of the termination hearing. Yet, even at the time of that hearing, neither Father nor M.A. took any responsibly for their emotional abuse and neglect of Children. Thus, there was not a single service provider who stated reunification was appropriate. Rather, all service providers and DCS employees who testified—and even Father's own brother—stated that reunification was not appropriate.

[19] There was also evidence of other reasons for Children's continued placement outside the home. Father had a lack of income and inadequate housing; even as of the date of the termination hearing, there was no bedroom for Children in Father's and M.A.'s home. Moreover, Father refused to cooperate with DCS in promptly signing releases so that S.D. could obtain necessary medication, and frequently refused to allow DCS to inspect his home to monitor his compliance with court orders.

[20] Given M.A.'s habitual and continued patterns of emotional abuse of Children and Father's on-going complicity in such abuse and neglect of Children's housing and medical needs, we cannot say the trial court erred in concluding that the conditions at the time of Children's removal were not, and likely will not be, remedied.

# Best Interests

[21] In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.S. v.*

*Ind. Dep't of Child Servs.* (*In re A.K.*), 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d at 224. Such evidence, "in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *L.S. v. Ind. Dep't of Child Servs.* (*In re A.D.S.*), 987 N.E.2d 1150, 1158-59 (Ind. Ct. App. 2013), *trans. denied*.

[22] Again, Father's contentions on this issue amount to requests that we reweigh the evidence, which we will not do. The evidence most favorable to the judgment shows that, throughout the CHINS and TPR proceedings, Father frequently failed to cooperate with DCS, failed to engage in all services as court-ordered, and failed to protect Children from, and/or was complicit in, M.A.'s emotional abuse. Father also failed to maintain appropriate housing for Children and failed to promptly cooperate in ensuring S.D.'s necessary medical care. Both the FCM and CASA recommended that Father's parental rights be terminated, as did five other witnesses for DCS, including Father's own brother. Given that testimony, in addition to evidence that the children need

permanency and stability that Father cannot provide and that the reasons for the children's removal from Father will not likely be remedied, we hold that the totality of the evidence supports the trial court's conclusion that termination is in Children's best interests. *In re A.D.S.*, 987 N.E.2d at 1158-59.

## Satisfactory Permanency Plan

[23] Finally, Father maintains that DCS failed to show that it had a satisfactory permanency plan for Children. We disagree. A permanency plan "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re D.D.*, 804 N.E.2d at 268 (citing *Jones v. Gibson Cty. Div. of Family and Children (In re B.D.J.)*, 728 N.E.2d 195, 204 (Ind. Ct. App. 2000)). DCS presented a plan for adoption of Children, including potential placement of Children with their relatives. Adoption is a satisfactory plan for permanency. *K.W. v. Ind. Dep't of Child Servs. (In re A.S.)*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied*. The trial court did not clearly err in holding that DCS had a satisfactory plan for Children's permanent placement.

[24] The trial court did not err when it terminated Father's parental rights to Children.

[25] Affirmed.

Kirsch, J., and Mathias, J., concur.